### BUNCH HUTCHINSON v. THE STATE.

No. 384.   Decided February 2, 1910.

#### 1.—Carrying Pistol—Evidence—Imminent Danger of Attack.

Upon trial for unlawfully carrying a pistol where defendant claimed that he carried the same because he had reasonable grounds for fearing an unlawful attack on his person, and the court submitted this phase of the case, there was no reversible error.

#### 2.—Same—Evidence—Self-Serving Declarations.

Upon trial for unlawfully carrying a pistol there was no error in excluding a conversation of the defendant as to why he carried the pistol, the State not having offered any part of said conversation, the same was self-serving.

#### 3.—Same—Evidence—Res Gestae.

Upon trial for unlawfully carrying a pistol there was no error in admitting in evidence the particulars of a shooting affair in which defendant was engaged; this was res gestae. Following Hines v. State, 57 Texas Crim. Rep., 216.

Appeal from the County Court of Nacogdoches. ` Tried below before the Hon. F. P. Marshall.

Appeal from a conviction of unlawfully carrying a pistol; penalty, a fine of $100.

The opinion states the case.

*Blount & Strong,* for appellant.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCORD, JUDGE.—This is an appeal from a conviction for unlawfully carrying on and about his person a pistol with a penalty of $100 fine.

In the month of April, 1908, the appellant and the State's witness, Granville Bruton, lived within about one half mile of each other in the county of Nacogdoches, and on the 30th of April, 1908, the wit-

ness Bruton testifies, he saw the appellant some 175 yards from his house between the witness' father's house and his own; that some words passed between them, and that the witness went to Douglas and saw the justice of the peace and filed a complaint against appellant; that he saw the appellant there when he filed the complaint; that this was about 2 o'clock p. m. and that about 4 o'clock p. m., he, witness, was at his father's house when appellant came by, passed on down the road beyond the house and then returned to the house and said to the witness that he wanted to compromise the matter. The witness replied, "No, I have gone to Douglas and indicted you, and I don't want anything to do with you." That appellant then said, "Well, Bruton, God-dam your soul, the only way we can settle this is to shoot it out, and one of us have got to go to hell;" that when he said that he jumped down off of his horse and started to shooting; that he had a pistol and was shooting with a pistol; that when the parties first met that morning appellant had a shotgun and then told the witness that he was ready to settle with him. The appellant took the stand and testified that he remembered the shooting between himself and Bruton; that he went to Douglas that day and that going to and from Douglas he had to pass by the home of the witness Bruton's father; that the witness Bruton lived about one half mile off of the road; that it was some four miles from Douglas to his home. Appellant further testified that he went to Douglas to see if he could get something done with Bruton for threatening his life; that the witness had cursed him that morning, and told him he never wanted anything to do with him, and said he would blow his God-dam brains out. The appellant further testified that one Johnson had told him the day before that the witness Bruton had been to his house to borrow buckshot shells and told him he intended to kill the appellant. The appellant further testified that he carried a pistol when he went to Douglas and that he carried it to protect himself, because the witness Bruton had that morning been to his house and got his gun, and that the witness was afraid to go to Douglas without his pistol, and that he went directly to Douglas with the pistol, and went to the justice of the peace and told him about the threats and told him to put the witness Bruton under a peace bond. Appellant further testified that he saw the witness Bruton at the justice of the peace's house at Douglas, and that he saw the witness pick up his gun and he thought then he was going to draw it on him and the justice made him put it down. The appellant then states that after leaving the justice of the peace's home he started back home, and that as he was passing in front of Bruton's father's house the witness Bruton made the remark that he was ready to settle it and reached and got his gun, when appellant jumped off of his horse and the witness Bruton fired at him and he fired back with the pistol. Several shots passed between the parties. The justice of the peace testified that the appellant came to his home in the village of Douglas about 2 o'clock, and that the witness Bruton was there when he came,

and that as appellant came up the witness Bruton picked up his gun and that he made him lay it down. He testifies: "The appellant stated to me that the witness Bruton had been making threats to kill him, and that he wanted him put under a peace bond. I told appellant to go on back home, that I did not think there would be any trouble." The State proved by another witness that appellant, as he was going to Douglas that morning, stated to the witness, to wit, Matilda Walker, that he was going up to Douglas to get some flour and other things for his wife. There was a good deal of testimony offered pro and con in the case on the question as to who was in the wrong in the difficulty that occurred between these parties, etc. The record is silent as to why the appellant, whom the proof shows to have had a double-barreled shotgun with him on the morning of the occasion between him and Bruton, should have left his shotgun at home and have taken his pistol when he went to Douglas. His claim was that he went to Douglas to have the witness Bruton arrested or put under a peace bond for threatening to take his life; that he was afraid of him and that was his defense. The record does not disclose who was in the right in this controversy. The court submitted the case to the jury, and directed them that they would not convict appellant, and should acquit him if at the time he carried the pistol he had reasonable grounds for fearing an unlawful attack upon his person, and the danger being so imminent and threatening as not to admit of the arrest of the party about to make the attack upon him upon legal process, and told the jury, in determining the question, they would take into consideration all the circumstances surrounding the parties, the threats that had been communicated to the appellant, the carrying of the gun by the party making the threats, and if the appellant had reasonable grounds for fearing an unlawful attack and that the danger was so imminent and threatening as not to admit of an arrest of the party about to make such attack upon legal process at the time the appellant armed himself with a pistol, he could not be convicted; and "this, although you may believe he fired the pistol before the person making the threats against the defendant, if any were made, fired upon the defendant." It will be noticed that there was a sharp controversy as to who fired first, whether the appellant or the witness Bruton. We have not set out the testimony of the collateral facts.

In the trial of the case the appellant offered to prove by one Dr. Wilson the conversation he had with appellant when he arrived at the village of Douglas, as to his purpose in coming there. This was clearly proved by the justice of the peace, and independent of proving it by the justice of the peace, we do not believe this testimony was admissible as it was self-serving in its character as to what he may have told a third party as to his purpose in going to the place. As we understand the rule, the State is always allowed to prove the declarations and sayings of a defendant, but the defendant is not permitted ordinarily to put his own declarations in issue, unless first the State has offered

part of the declarations. Then in such case the testimony would be admissible. However, this does not fall within the rule. But it is said by appellant that this is explanatory of the testimony of the witness, Matilda Walker, who testified to what appellant said was his purpose in going to the town of Douglas. This was in no sense explanatory, no part of said conversation, but was a contradiction of that statement. We do not think this testimony was admissible.

There are a number of bills of exceptions in the record, and also several special charges were requested. We are of opinion, however, that none of these exceptions and special charges present sufficient grounds to authorize a reversal. The issue as made by the testimony in the case was, we think, fairly submitted to the jury and they have found adversely to appellant's contention, and in view of the fact that the testimony was very conflicting as to who was in the wrong in the matter, and it further appearing that appellant was as aggressive, if not more so, as the prosecuting witness, we are not inclined to hold as a matter of law that the facts as presented justified the appellant in carrying the pistol at the time he did.

Objections were made to the court permitting the State, over appellant's objections, to give the particulars of the shooting affair and as to who fired the first shot, etc. We think all this testimony was admissible as res gestae and as developing the truth of the matter as to whether the appellant's intentions were lawful or unlawful in carrying the pistol for protection or for aggressive combat. See Hines v. State, 57 Texas Crim. Rep., 216, 123 S. W. Rep., 411.

Believing that the issues were fairly submitted by the court in this case, and the jury having found adversely to appellant's contentions, and finding no error of such a prejudicial character as would warrant us in reversing the case, the judgment of the court below is affirmed.

*Affirmed.*